NEW YORK CENTRAL RAILROAD COMPANY, A CORPORA-
TION, PLAINTIFF, v. SINGER MANUFACTURING COM-
PANY, DEFENDANT.

Submitted July 11, 1925—Decided August 22, 1925.

Common Carriers—Liability For Payment of Freight Charges—
Consignor Primarily Liable—Contract of Shipment or Terms
of Bill of Lading May Change Such Liability—Defendant Con-
signed Freight to Consignee Over Plaintiff's Road—Consig-
nee Paid Amount Demanded by Plaintiff and Became In-
solvent Before Error in Amount Due Plaintiff was Discov-
ered—Contract and Bill of Lading Examined and Held That
Nothing Appeared to Modify Rule Regarding Consignor's
Liability—Judgment For Plaintiff.

Action at law.

The opinion of the court was delivered by

CUTLER, J.   The plaintiff is a corporation of the State of New York, authorized to do business in the State of New Jersey, and having its principal office in New Jersey at Weehawken.

The defendant is a corporation of the State of New Jersey, having its office and principal place of business at Trumbull and Second streets in the city of Elizabeth, this state.

On or about September 4th, 1920, Philip E. Wright entered into an agreement with the Hudson Valley Foundry Company, a corporation of the State of New York, having its principal place of business at Kingston, New York, whereby the Hudson Valley Foundry Company agreed to purchase, and the said Wright agreed to sell, a carload of Netcong pig iron at a stipulated price per ton (2,240 pounds) f. o. b. car, Netcong, New Jersey.

The pig iron to fill this contract was purchased by the said Wright from the defendant at Netcong, New Jersey, and the said Wright, after the purchase of said iron, directed this defendant to ship the same by rail, consigned to the Hudson Valley Foundry Company, Kingston, New York.

On September 4th, A. D. 1920, the defendant, pursuant to said instruction, delivered said pig iron to the Delaware, Lackawanna and Western Railroad Company, whereupon there was issued by said railroad company a bill of lading covering said pig iron. The defendant, by its duly authorized agent, signed this bill of lading as shipper..

On or about the same day the said Wright entered into another agreement with the Hudson Valley Foundry Company whereby the Hudson Valley Foundry Company agreed to purchase, and the said Wright agreed to sell, a second carload of Netcong pig iron at the stipulated price per ton (2,240 pounds) f. o. b. car, Netcong, New Jersey.

The pig iron to fill this contract was also purchased by the said Wright of the defendant at Netcong, New Jersey, and the said Wright, after purchasing the same, directed the said defendant to ship the said last-mentioned pig iron by

rail consigned to the Hudson Valley Foundry Company, Kingston, New York.

On September 4th, 1920, pursuant to such instruction, the defendant delivered said pig iron to the Delaware Lackawanna and Western Railroad Company, whereupon there was issued by said railroad company a bill of lading covering the said last-mentioned pig iron.

This defendant, by its duly authorized agent, signed this last-mentioned bill of lading as shipper.

On or about the 5th day of September, 1920, the said Wright entered into a third agreement with the Hudson Valley Foundry Company, whereby the Hudson Valley Foundry Company agreed to purchase, and the said Wright agreed to sell, a third carload of Netcong pig iron at a stipulated price per ton (2,240 pounds) f. o. b. car, Netcong, New Jersey.

The said Wright, after purchasing the pig iron to fill this third order from the defendant, directed the defendant to ship it by rail consigned to the Hudson Valley Foundry Company, Kingston, New York.

On September 5th, 1920, the defendant, pursuant to the last-mentioned instruction, delivered the last-mentioned pig iron to the Delaware, Lackawanna and Western Railroad Company, whereupon there was issued by said railroad company a bill of lading covering this third shipment of iron.

The defendant, by its duly authorized agent, signed this third bill of lading as shipper.

All three bills of lading were delivered by the defendant to said Wright, who forwarded them to the Hudson Valley Foundry Company.

No freight charges were demanded of or paid by the defendant at the time of the delivery of these consignments of pig iron, or any of them, to the Delaware, Lackawanna and Western Railroad Company.

Each of these shipments of pig iron was transported by the Delaware, Lackawanna and Western Railroad Company from Netcong, New Jersey, to Bergen Junction, New Jersey, and

from thereby the Erie Railroad Company to Little Ferry, New Jersey, and from there by the plaintiff to Kingston, New York, where, on or about September 24th, 1920, upon surrender by the Hudson Valley Foundry Company of the three bills of lading covering the three shipments of pig iron, the plaintiff delivered the same to the consignee, the Hudson Valley Foundry Company.

At the time of the delivery of the pig iron the plaintiff demanded and received from the Hudson Valley Foundry Company, as freight charges and war tax, on the first shipment $58.34, on the second shipment $59.27, and on the last shipment $58.26, which sums were all that was then claimed to be due as freight charges and war tax on said shipments.

Subsequently, the plaintiff learned that, through error of one or more of its employes or of the employes of its connecting carriers, the amount for freight collected on said shipments, respectively, was less than the amount which should have been collected in accordance with the existing tariff, classifications and regulations pertaining to such shipments.

At the time the said iron was so transported and said services were so performed, the plaintiff and its connecting carriers were common carriers for hire, and engaged in interstate traffic, and at least thirty days prior to such transportation and services, or any part thereof, had filed with the interstate commerce commission, and at their stations, tariffs, classifications and regulations showing the rates and charges for the transportation and services aforesaid, and had established said rates and charges, which they deemed reasonable and proper as applicable to such transportation and services, and computed in accordance with the provisions of said tariffs, classifications and regulations, the charges for said transporation and services and tax should have been on the first shipment $120.85, on the second shipment $121.93, and on the last shipment $117.88.

At the time of these deliveries, and for four months thereafter, the Hudson Valley Foundry Company was solvent, and paid all its bills in due course of its business.

Since that time, and prior to the institution of this suit, the Hudson Valley Foundry Company became insolvent and is no longer in business, and is without any property out of which any portion of the balance now claimed to be due for excess freight on the said shipments can be satisfied.

At the time the Hudson Valley Foundry Company became insolvent and prior thereto, neither the plaintiff, nor either of the connecting carriers, had knowledge or had received notice that the said property so transported had been purchased by the said Wright from the defendant or had been sold by the said Wright to the Hudson Valley Foundry Company, or that the said Wright, after the purchase of said pig iron, directed the defendant to ship it, or any part of it, to the Hudson Valley Foundry Company, or that the defendant was not the owner of said pig iron, or any of it, at the time it was delivered by the defendant to the Delaware, Lackawanna and Western Railroad Company, and the bills of lading issued therefor, nor had they made any inquiry in respect thereto.

All claims of the connecting carriers of the plaintiff for freight and other charges by reason of the transportation of this pig iron has been assigned to the plaintiff. Demand was made upon the defendant by the plaintiff to pay the difference between the amount of freight charges and war tax, in accordance with the provisions of the published tariffs, classifications and regulations aforesaid, and the amount paid by the Hudson Valley Foundry Company on each of said shipments, which difference amounted on the first shipment to $62.51, on the second shipment to $62.66, and on the last shipment to $59.62, or a total of $184.79, no part of which the defendant has paid or is willing to pay.

This suit was therefore instituted by the plaintiff on September 12th, 1923, to enforce the payment of this balance. There are no disputed facts, and the question to be decided is, can the plaintiff, under these facts, recover against the defendant?

Both the counsel for the plaintiff and the defendant in their briefs have referred to the case of Louisville and Nash-

ville Railroad Co. *v.* Central Iron and Coal Co., in which the judgment of the Circuit Court of Appeals for the Fifth Circuit was affirmed by the United States Supreme Court, 1924. 265 *U. S. Rep.* 59.

In some respects that case was similar to this one. The Supreme Court said, among other things, in that case:

"But delivery of goods to a carrier for shipment does not, under the Interstate Commerce act, impose upon a shipper an absolute obligation to pay the freight charges."

In the same case the court also said in its opinion:

"Nor does delivery of goods to a carrier necessarily import, under the general law, an absolute promise by the shipper to pay the freight charges. We must, therefore, determine what promise, if any to pay freight charges, was, in fact, made by the Central company."

Again, the Supreme Court said in that case:

"To ascertain what contract was entered into we look primarily to the bills of lading, bearing in mind that the instrument serves both as a receipt and as a contract.

"Originally, the person from whom the goods are received for shipment assumes the obligation to pay the freight charges, and his obligation is, ordinarily, a primary one.

"This is true even where the bill of lading contains, as here, a provision imposing liability upon the consignee. For the shipper is presumably the consignor; the transportation ordered by him is presumably on his own behalf, and a promise by him to pay therefor is inferred [that is, implied in fact] as a promise to pay for goods is implied when one orders them from a dealer. But this inference may be rebutted, as is the case of other contracts. It may be shown by the bill of lading, or otherwise, that the shipper of the goods was not acting in his own behalf; that this fact was known by the carrier; that the parties intended, not only that the consignee should assume an obligation to pay the freight charges, but that the shipper should not assume any liability whatsoever, or that he should assume only a secondary liability."

While these two cases are somewhat similar, there is a difference in the facts, which changes the situation. The Supreme Court found in this Central Iron and Coal case that—

"The bills of lading acknowledged receipt of the coke from the Central company.

"But it did not sign them. Nor was it described therein as the consignor. There was no clause by which the shipper agrees expressly either to pay the freight charges or to guarantee their payment. The goods received were not declared to be deliverable to the Central company's order. On the contrary, the form of the bills of lading indicated that it was neither the owner nor the person on whose behalf the shipment was being made."

Under this state of facts the Supreme Court affirmed the finding of the Circuit Court of Appeals of the Fifth Circuit that there could be no recovery.

In the present case all three bills of lading have, among others, the following condition:

"The owner or consignee shall pay the freight and all other lawful charges accruing on said property, and, if required, shall pay the same before delivery," which was one of the conditions in the bills of lading in the Central Iron and Coal Company case.

In the present case the defendant signed all three bills of lading, designating itself in each one of them as the "shipper," and a shipper unless the contrary appears is presumably the consignor.

Nothing appears in the bills of lading in this case to indicate that the defendant was not the owner or the consignor of this pig iron, or that the Delaware, Lackawanna and Western Railroad Company was to look to some other person as the owner or consignor from whom the freight and other charges could be collected if the consignee did not pay the same.

There is nothing in these bills of lading that would in any way indicate that Wright had any interest in this pig iron.

There was an implied promise on the part of this defendant when it shipped this pig iron and signed the bills of lading

as shipper, without notifying the carrier that it was neither the owner or consignor of this pig iron, to pay the freight and other charges.

The fact that the consignee accepted this pig iron, and paid the freight charges and war tax then demanded, does not relieve the defendant from liability.

Neither does the fact that an error was made by the plaintiff, or one of the other carriers, which resulted in the delivery of this pig iron to the consignee without the payment of the full freight charge and war tax, or that the consignee became insolvent before the institution of this suit, relieve this defendant from the obligation to pay these excess charges; neither is the plaintiff estopped from recovering, because it allowed the consignee to become insolvent before it instituted this suit. It has been held that "no contract of the carrier would reduce the amount legally payable, or release from liability a shipper who had assumed an obligation to pay the charges; nor could any act of omission of the carrier [except the running of the statute of limitations] estop or preclude it from enforcing payment of the full amount by a person liable therefor." *Louisville and Nashville Railroad Co.* v. *Central Iron and Coal Co.*, 265 *U. S. Rep.* 59; *Pittsburgh, C. C. & St. L. Railroad Co.* v. *Fink*, 250 *U. S. Rep.* 577.

The conclusion reached is that the plaintiff can recover the amount of this excess freight and other charges amounting to $184.79, with interest.

As nothing was said on the oral argument, or mention made in the briefs as to when the interest would begin to run, I will allow the parties ten days to present briefs on this question, if they so desire, and will withhold the signing of the findings of facts and *postea* until that time.